# Exhibit 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-7304-GW(MRWx) | Date | December 6, 2018 |
|---|---|---|---|
| Title | *Arnulfo Esquivel v. Charter Communications, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | | |
|---|---|---|---|
| Javier Gonzalez | Katie Thibodeaux | | |
| Deputy Clerk | Court Reporter / Recorder | | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: | |
| Jeff D. Neiderman | | Casey L. Morris | |

**PROCEEDINGS:** **DEFENDANT CHARTER COMMUNICATIONS, INC.'S MOTION TO COMPEL ARBITRATION AND TO STAY ACTION PENDING ARBITRATION [15]**

Court hears oral argument. The Court's Tentative Ruling is circulated and attached hereto. The Court will grant the motion. This action will be stayed pending completion of the arbitration.

The Court sets a status conference re arbitration for February 25, 2019 at 8:30 a.m., with a joint status report to be filed by February 20, 2019.

All previously set deadlines and dates are vacated and taken off-calendar.

| | : | 04 |
|---|---|---|
| | Initials of Preparer | JG |

*Esquivel v. Charter Commc'ns, Inc.*, Case No. 2:18-cv-07304-GW-(MRWx)
Tentative Ruling on Motion to Compel Arbitration and to Stay Action Pending Arbitration

**I. Background**

On August 1, 2018, Arnulfo Esquivel ("Plaintiff") sued Charter Communications, Inc. ("Defendant") in Los Angeles County Superior Court. The Complaint contained fifteen causes of action, for: 1) wrongful termination/retaliation in violation of public policy (California Government Code § 12940, et seq.); 2) wrongful termination/retaliation in violation of public policy (California Labor Code § 1102.5, et seq.); 3) discrimination based upon disability (California Government Code § 12940, et seq.); 4) failure to accommodate (California Government Code § 12940(k), (m)); 5) failure to engage in the interactive process (California Government Code § 12926.1(e)); 6) failure to take all reasonable steps to prevent discrimination and retaliation (California Government Code § 12940, et seq.); 7) violation of California Family Rights Act; 8) intentional infliction of emotional distress; 9) violation of rest period law (Industrial Welfare Commission Wage Orders; California Labor Code § 226.7); 10) violation of meal period law (California Labor Code §§ 226.7, 512); 11) violation of wage and hour laws – unpaid overtime wages (California Labor Code §§ 510, 1194); 12) violation of wage and hour laws – waiting time penalties (California Labor Code §§ 202, 203); 13) failure to pay wages (California Labor Code §§ 204, 207); 14) failure to provide accurate wage statements/failure to keep records (California Labor Code §§ 210, 226); and 15) unfair competition in violation of Business and Professions Code § 17200, et seq. Defendant removed the case to this Court on August 20, 2018, citing complete diversity as a basis for this Court's federal subject matter jurisdiction.

Plaintiff worked as a non-exempt senior service technician for Defendant beginning in or about March 2015. *See* Complaint ¶ 2. On or about July 19, 2017, Plaintiff sustained an injury on the job, suffering several bites when he was required to go underneath a house that was infested with fleas and ticks. *See id.* ¶ 3. Following the incident, Plaintiff's doctor requested that Plaintiff be placed on light duty. *See id.* ¶ 4. Told that there was no light duty available for technicians, Defendants sent Plaintiff home and placed him on leave for approximately 30 days. *See id.* ¶ 5.

When Plaintiff returned to work on or about August 29, 2017, he picked up his work van and began driving it. *See id.* ¶ 6. Immediately upon entering the vehicle, Plaintiff noticed a strange odor and called his supervisor. *See id.* His supervisor informed him that it was nothing – when in fact Plaintiff later learned that Defendant had fumigated his vehicle with a pesticide after Plaintiff's flea-and-tick report – and that he should just turn on the air conditioner to air out the van. *See id.* ¶¶ 6, 15. That did not successfully remove the odor. *See id.* ¶ 6. Shortly thereafter, Plaintiff began experiencing medical symptoms, including severe headaches and blurry vision. *See id.* ¶ 7. Plaintiff reported this to his supervisor. *See id.*

Due to his condition and the severity of his headaches, Plaintiff sought medical treatment and was rendered disabled. *See id.* ¶ 8. Due to his condition, he was required to take a medical leave of absence for approximately three weeks, after which his doctor returned Plaintiff to work with restrictions. *See id.* Defendant never engaged in the interactive process or accommodated Plaintiff's restrictions. *See id.* ¶ 9.

Following the August 29, 2017 incident, Plaintiff filed for workers' compensation benefits, but his disability was held against him, and he was discriminated and retaliated against. *See id.* ¶ 10. For instance, Defendant refused his requests for accommodation and taking time off, it falsely criticized his performance, and it changed his schedule and increased his workload in order to overwhelm Plaintiff. *See id.* Plaintiff complained about this conduct to managerial and supervisory employees, but nothing was done. *See id.* ¶ 11.

Then, on or about March 2, 2018, Defendant informed Plaintiff that it was terminating him for an alleged violation of company policy. *See id.* ¶ 12. Specifically, Defendant asserted that Plaintiff had given out his personal telephone number to a customer and also charged a customer to run a line in her home. *See id.* Notwithstanding the fact that the company maintained a progressive discipline policy and the fact that Plaintiff had no prior record of discipline, Defendant summarily terminated Plaintiff. *See id.*

At some point in time after Plaintiff returned to work on August 29, 2017, but before he was terminated, Plaintiff filed a report with the California Department of Agriculture regarding his pesticide exposure (due to Defendant's fumigation of his work vehicle), which he believed had resulted from pesticide use in violation of federal, state and local regulations. *See id.* ¶¶ 16, 45. Plaintiff also ties the foregoing assertions of

retaliation to this report. *See id.* ¶ 17.

While employed with Defendant, Plaintiff worked overtime hours, but was not paid overtime, and was never provided with rest and meal periods or, when such periods were provided, Defendant required Plaintiff to work through them. *See id.* ¶ 18. Defendant also required Plaintiff to clock-out at the end of his shift, but to continue working, and Plaintiff was never paid for his post-clock-out work. *See id.* ¶ 19.

Plaintiff seeks compensatory and punitive damages, medical and related expenses, lost earnings and related expenses, wages, interest, damages and penalties, attorneys' fees and costs, prejudgment interest, civil penalties, and other just and proper relief. *See* Complaint at 31:6-32:1. Plaintiff does not explicitly seek injunctive relief, including with respect to his claim under Business and Professions Code § 17200. *See id.* ¶¶ 194-200. However, the final paragraph alleged under that claim could be seen as an implicit request for such relief: "Unless restrained, Defendants will continue in the acts and conduct set forth above, to Plaintiff's great and irreparable injury, for which damages will not afford adequate relief." *Id.* ¶ 200.

Defendant now moves to compel arbitration and to stay this litigation until the completion of that arbitration.

## II. Analysis

"A party seeking to compel arbitration has the burden under the [Federal Arbitration Act] to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).[1] This is in recognition of the rule that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002)

---

[1] Although he denies that there is an enforceable arbitration agreement, Plaintiff does not contest that the Federal Arbitration Act applies here, a point Defendant makes in its opening brief when it asserts that not only is it "clearly engaged in interstate commerce," but the arbitration agreement itself provides that it "will be governed by the Federal Arbitration Act." *See* 9 U.S.C. § 2 ("A written provision in any…contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction…shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."); *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1154 (9th Cir. 2008) ("The Supreme Court has concluded that contracts 'evidencing a transaction involving . . . commerce' include employment contracts."); *see also* Docket No. 15, at 15:10-12; Exh. C (Docket No. 15-1), at pg. 30 of 61.

3

(omitting internal quotation marks).[2]

  A. <u>Existence of the Agreement to Arbitrate</u>

  The parties do not dispute that on October 6, 2017, Defendant e-mailed to all of its employees[3] an announcement that it was implementing a "Solution Channel Program" ("the Program") that "allows [the employee] and the company to efficiently resolve covered employment-related legal disputes through binding arbitration." *See* Affidavit of Tammie Knapper ("Knapper Aff."), Docket No. 15-1, ¶¶ 4-7 & Exh. A at pg. 21 of 61. The announcement stated that "[b]y participating in [the Program], [the employee] and [Defendant] both waive the right to initiate or participate in court litigation (including class, collective and representative actions) involving a covered claim and/or the right to a jury trial involving any such claim," and further indicated that an employee would be enrolled in the Program unless he or she opted out within 30 days. *See id.* The announcement also advised that "[m]ore detailed information about [the Program] is located on Panorama" – Defendant's intranet site accessible to employees – along with "[i]nstructions for opting out," *id.*, and provided a link to the Panorama page devoted to the Program, *see* Knapper Aff., ¶ 9.[4]

  There is no dispute that the e-mail including the announcement of the Program was sent to Plaintiff's work e-mail address and that Plaintiff did not opt out of the Program.[5]

---

[2] Both parties believe that the Court is to apply a summary judgment-like standard to the question of whether Plaintiff agreed to an arbitration agreement. *See, e.g.*, *Lopez v. Terra's Kitchen, LLC*, 331 F.Supp.3d 1092, 1096-97 (S.D. Cal. 2018); *Omstead v. Dell, Inc.*, 533 F.Supp.2d 1012, 1037 (N.D. Cal. 2008).

[3] In reality, the evidence is that the e-mailed announcement was made "to all non-union employees below the level of Executive Vice President, who were active, *or who were not on a leave of absence*" on October 6, 2017. Affidavit of Tammie Knapper ("Knapper Aff."), Docket No. 15-1, ¶ 5 (emphasis added). The evidence is that Plaintiff *was* on a leave of absence on that date. *See* Declaration of Arnulfo Esquivel, Docket No. 17-1, ¶¶ 3-4. However, the evidence also indicates that Plaintiff was included on the distribution list for the e-mail and that the e-mail was sent to his work e-mail address. *See id.* ¶ 20; Declaration of Lillian Gomez ("Gomez Decl."), Docket No. 15-1, ¶¶ 4-5 & Exh. E. The answer to this curiosity may come in the Declaration of Lillian Gomez, which indicates that the e-mail was not delivered to those employees who were on "a *long-term* leave of absence." Gomez Decl. ¶ 4 (emphasis added).

[4] While supporting affidavits assert that the Panorama page included specific information about opting out, *see* Knapper Aff., ¶¶ 11-12 and Gomez Decl., ¶ 7, that information is not actually reflected in the Panorama page attached to Defendant's papers as an exhibit, *see* Docket No. 15-1, Exh. B. There is, however, no apparent dispute that a 30-day opt-out period was provided to employees.

[5] Defendant does not offer evidence of actual receipt (in the form of, for instance, Plaintiff's actual work e-mail inbox), but Plaintiff likewise does not offer evidence demonstrating non-receipt. Plaintiff's failure to

4

*See* Knapper Aff., ¶¶ 5-6, 20-21. The actual arbitration provision (a link to which was listed on Panorama under the heading "Key Documents," identified as "Mutual Arbitration Agreement," *see* Exh. B (Docket No. 15-1), at pgs. 23-24 of 61) covers "any dispute arising out of or relating to your . . . employment with [Defendant] or the termination of that relationship." Declaration of Lillian Gomez, Docket No. 15-1, Exh. C at pg. 26 of 61. It then provided a specific paragraph under the heading "Covered Claims" that listed "the following disputes, claims, and controversies" that would be "submitted to arbitration in accordance with this Agreement," including:

> all disputes, claims, and controversies that could be asserted in court . . . for which you or [Defendant] have an alleged cause of action related to . . . employment, employment termination or post-employment-related claims, whether the claims are denominated as tort, contract, common law, or statutory claims (whether under local, state or federal law), including without limitation . . .: . . . claims for unlawful termination, . . . wage and hour-based claims including claims for unpaid wages, commissions, or other compensation or penalties (including meal and rest break claims, claims for inaccurate wage statements, claims for reimbursement of expenses); unlawful discrimination or harassment (including such claims based upon race, color, national origin, sex, pregnancy, age, religion, sexual orientation, disability, and any other prohibited grounds), claims for unlawful retaliation, claims arising under the Family Medical Leave Act, Americans with Disabilities Act or similar state laws, including unlawful denial of or interference with a leave of absence, claims for unlawful denial of accommodation or failure to engage in the interactive process, whistleblower claims, . . . [and] claims for violations of Occupational Safety and Health Administration or other safety or occupational health, whether arising before, during or after the termination of your employment.

*Id.* Also included are "all disputes related to the arbitrability of any claim or controversy."

*Id.* Preceding all of this was a "NOTICE" which, in all-capital letters, stated:

> PLEASE READ THE FOLLOWING MUTUAL ARBITRATION AGREEMENT . . . CAREFULLY. IF YOU ACCEPT THE TERMS OF THE AGREEMENT (WHETHER YOU ARE AN APPLICANT, CURRENT EMPLOYEE, OR FORMER EMPLOYEE), YOU ARE AGREEING TO SUBMIT ANY COVERED EMPLOYMENT − RELATED DISPUTE BETWEEN YOU AND [DEFENDANT] TO BINDING ARBITRATION. YOU ARE ALSO AGREEING TO WAIVE

---

contest the evidence that the e-mail was addressed to his work e-mail address means that, application of a "mailbox rule" presumption or not, the Court has no reason to conclude that the e-mail was not, in fact, received in the "inbox" of Plaintiff's work e-mail account.

5

ANY RIGHT TO LITIGATE THE DISPUTE IN A COURT AND/OR
HAVE THE DISPUTE DECIDED BY A JURY.

*Id.* Plaintiff offers no argument that any of his claims fall outside the scope of the arbitration provision.[6]

What Plaintiff does argue, however, is that there was never any enforceable agreement to arbitrate to begin with because he was not working at the time of the October 6, 2017, e-mail due to the fact that he was out on leave.[7] He asserts that he never opened or read the e-mail, never received the arbitration agreement and never "acknowledged" it.

In further support of his argument, Plaintiff explains that he would routinely receive over 100 e-mails each day on his work e-mail account, meaning that he had hundreds of e-mails in his inbox when he returned from his periods of leave. *See* Declaration of Arnulfo Esquivel ("Esquivel Decl."), Docket No. 17-1, ¶¶ 5-6. Given the "time constraints and demands" of his job, "which required that Plaintiff be out in the field constantly responding to customer calls," he notes that he simply did not always have the time to "open and immediately review" all of the e-mails. Docket No. 17, at 5:26-6:1; Esquivel Decl., ¶ 5. He does not recall seeing any e-mail marked "high importance" from Defendant (Defendant does not assert that the October 6, 2017, e-mail was sent marked as "high importance"). *See id.* ¶ 7. He also notes that he was never sent – or at least Defendant does not assert that it sent – a follow-up e-mail advising of the upcoming deadline for opting-out. *See id.* ¶ 8.

Plaintiff relies upon the district court decision in *Narez v. Macy's W. Stores, Inc.*,

---

[6] As a result, Defendant's arguments concerning a) doubts about arbitrability being resolved in favor of arbitration and b) the issue of arbitrability being properly reserved for the arbitrator need not be addressed here (though the Court has no reason to disagree with Defendant's positions on those points), except for perhaps in connection with any claim for injunctive relief under Business and Professions Code § 17200.

[7] While Plaintiff also asserts that there could not have been a contract because there was "no consideration" ("Plaintiff was asked to assume a legal obligation without Defendant suffering a legal detriment," Docket No. 17, at 10:15-17), Defendant correctly points out that the agreement is a mutual one, meaning that *both parties* gave up rights to litigate in court. There was, thus, clearly adequate consideration for an enforceable agreement. *See Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002) ("Circuit City's promise to be bound by the arbitration process itself serves as adequate consideration.").

Plaintiff also baldly states – *i.e.*, without citation to any supporting authority – that "the existence of the opt-out provision in and of itself reflects that the parties had not agreed on the terms of the contract." Docket No. 17, at 10:20-22. Absent any case law support for this proposition, the Court rejects the suggestion that the mere existence of an opt-out provision precludes the enforceability of an agreement where assent is to be signaled by not exercising the opt-out right.

6

No. 16-cv-00936-LHK, 2016 WL 4045376 (N.D. Cal. July 28, 2016), to support his proposed rule that "[w]here . . . a company attempts to deprive its employees of their Constitutional right to a jury trial based on an opt out arbitration agreement, it should be able to, at minimum, show that the employee actually received and had knowledge of the purported agreement before it is allowed to strip that employee or former employee of his/her Constitutional rights." Docket No. 17, at 2:4-15. He relies upon the same decision for the proposition that "where, as here, the purported agreement contains a so-called 'opt-out provision,' 'the Ninth Circuit has held that opt-out arbitration provisions in the employment context are enforceable where . . . the employee acknowledges the agreement in writing and has thirty days in which to opt out of the arbitration agreement.'" *Id.* at 8:7-13 (quoting *Narez*, 2016 WL 4045376, at *4); *see also id.* at 11:13-15.[8]

Plaintiff has creatively tried to draw from the facts of *Narez* hard-and-fast requirements, but the decision – issued by a district court, in any event – made no such attempt to establish minimal enforceability standards. While *Narez* did state that "the Ninth Circuit has held that opt-out arbitration provisions in the employment context are enforceable where, as here, the employee acknowledges the agreement in writing and has thirty days in which to opt out of the arbitration agreement," 2016 WL 4045376, at *4, it did not characterize that holding as indicating those are the *only* circumstances, or the *minimal* circumstances, that would suffice for enforceability. The Ninth Circuit decision *Narez* cites in that regard, *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104 (9th Cir. 2002), also did not attempt to set out any requirements. It simply concluded that it was permissible to infer that an employee had assented by failing to opt-out when, among other things, he had signed an acknowledgment form and had thirty days to review the agreement, not that those factors were *prerequisites* to concluding an employee had assented. *See id.* at 1109.

In addition, Plaintiff cites another district court decision – *Carmax Auto Superstores Cal. LLC v. Hernandez*, 94 F.Supp.3d 1078, 1098 (C.D. Cal. 2015) – for that decision's statement that "[b]efore a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect." But that language in *Carmax* appears only in a parenthetical quotation from the

---

[8] Plaintiff asserts at the outset of his Opposition brief that "[m]otions to compel arbitration are universally based upon received and acknowledged written agreements." Docket No. 17, at 1:4-5. But he offers no citation for that broad proposition.

7

Case 2:18-cv-00820-RWM Document 28-3 Filed 01/28/19 Page 10 of 18 PageID #:466

Third Circuit's 1980 decision in *Par-Knit Mills, Inc. v. Stockbridge Fabrics Company, Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980), a case that is obviously non-binding here (and which itself cites to no decision, under any state's law, establishing or suggesting that rule). Moreover, the Third Circuit itself has walked-back that standard. *See Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 287-89 (3d Cir. 2017); *see also Pellegrino v. Morgan Stanley Smith Barney LLC*, No. 17-CV-7865 (RA), 2018 WL 2452768, *4 (S.D.N.Y. May 31, 2018) (rejecting plaintiff's reliance on cases requiring arbitration agreements be established by "clear, explicit, and unequivocal" agreement because "[f]ederal courts . . . have consistently rejected any heightened standard for proving arbitration agreements").

Relying on *Campbell v. General Dynamics*, 407 F.3d 546, 557 (1st Cir. 2005), Plaintiff also more generally asserts that "as Plaintiff had no knowledge of any arbitration agreement presented to him, there cannot have been a meeting of the minds," a precondition to an enforceable contract. Docket No. 17, at 10:8-11. The First Circuit's analysis in that regard stemmed from its preliminary conclusion that "[w]hen a party relies on the [Federal Arbitration Act] to assert a contractual right to arbitrate a claim arising under a federal employment discrimination statute, the court must undertake a supplemental inquiry" because "some federal statutory claims may not be appropriate for arbitration." *Id.* at 552. It relied on its earlier decision in *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir. 1999), a case considering a Title VII claim, *see Campbell*, 407 F.3d at 553 n.4, which it noted had "determined that the employer must afford 'some minimal level of notice to the employee that statutory claims are subject to arbitration' in order for arbitration to be deemed appropriate." *Id.* at 554 (quoting *Rosenberg*, 170 F.3d at 21). Thus, *Campbell* (which assumed the validity of the contract under Massachusetts law, *see id.* at 555) defined its inquiry as determining "whether General Dynamics's e-mail announcement of the Policy provided sufficient notice to the plaintiff that his continued employment would constitute a waiver of his right to litigate any employment-related ADA claim, thereby rendering judicial enforcement of that waiver appropriate." *Id.* at 554. Plaintiff has advanced no federal statutory claims here. *Campbell*, therefore, does not serve his purpose.

Finally, Plaintiff directs the Court to a district court decision from the District of New Jersey which he says "held that an employer could not enforce its arbitration

8

agreement, which its former employee said he never saw, simply because the employer e-mailed it to him once and inferred that, by continuing his employment, he had consented to arbitration." Docket No. 17, at 11 n.1 (citing *Schmell v. Morgan Stanley & Co., Inc.*, No. 17-13080, 2018 WL 1128502 (D.N.J. Oct. 3, 2018)). *Schmell* applied New Jersey law to the effect that "an arbitration provision cannot be enforced against an employee who does not sign or otherwise explicitly indicate his or her agreement to it." 2018 WL 1128502, at *2 (D.N.J. Mar. 1, 2018) (omitting internal quotation marks) (quoting *Leodori v. CIGNA Corp.*, 814 A.2d 1098, 1106 (N.J. 2003)). Notwithstanding its recognition that, under New Jersey law, where an arbitration agreement stated an employee would accept its terms through continued employment, such an agreement would bind an employee who continues employment beyond the agreement's effective date, *see id.* at *3, the district court simply determined – at least initially – that because there was a genuine dispute of material fact as to whether the plaintiff was on notice of the agreement to arbitrate, and a genuine dispute "as to whether the alleged assent through continued employment without opt-out was knowing and voluntary," it could not find that Plaintiff was bound to arbitrate. *See id.* at *4. However, after the parties took limited discovery on the question of whether the plaintiff had notice of the agreement, the Court *granted* the motion to compel arbitration. *See Schmell v. Morgan Stanley & Co., Inc.*, No. 17-13080, 2018 WL 4961469 (D.N.J. Oct. 15, 2018). It concluded that the plaintiff had notice because:

> [t]he parties do not dispute that the email was sent to Plaintiff, in the sense that the email appeared in Plaintiff's inbox. Plaintiff was required to review all work email as a condition of his employment, was working the day the email was sent, responded to other emails that day, and answered emails that were sent both before and after the one in question. All of these facts establish that Plaintiff had notice of the email.
> Plaintiff claims that he never read the email in which the Agreement was sent, and does not recall reviewing it. He also states that he could receive many, possibly hundreds, of emails in a single day. But whether Plaintiff specifically recalls the email in question is beside the point. The fact that the email appeared in Plaintiff's inbox, combined with the expectation that Plaintiff would read his email, is sufficient to indicate that Plaintiff had notice of the Agreement.

*Id.* at *2 (omitting internal record citations). The only factual distinction with our case is that Plaintiff here was out on leave on the day the e-mail was sent (but then worked for much of the period provided for him to opt-out).

9

A case by case refutation of these authorities is sufficient, but may not, in the end, be necessary. If what Plaintiff is attempting to do by (unsuccessfully, in the end) relying upon these authorities is to fashion a special rule for contractual enforceability that applies solely in the context of arbitration agreements – or even more specifically, solely in the context of employer-employee arbitration agreements – such an approach runs contrary to the repeated message on this topic from the Supreme Court. Arbitration agreements are not to be placed on an unequal footing with other contracts. *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).

In its Reply, Defendant states that "the law is clear that where, as here, an employee does not deny that he received an email containing information related to an opt-out arbitration program, the failure to opt out evidences a valid agreement to arbitrate, notwithstanding the fact that the employee was absent from work during part of the opt-out period, did not sign an acknowledgement of receipt of the arbitration agreement, and never read the email." Docket No. 18, at 6:13-18. Defendant cites to at least a few district court decisions appearing to support the critical points of that contention – that the agreement can be binding notwithstanding the fact that an employee does not read it or acknowledge its receipt. *See Bolden v. AT & T Servs., Inc.*, No. 18-2306-JWL, 2018 WL 4913901, *5 (D. Kan. Oct. 10, 2018); *Marchand v. Northrop Grumman Corp.*, No. 16-cv-06825-BLF, 2017 WL 2633132, *5 (N.D. Cal. June 19, 2017) ("A party's failure to read or understand what she was signing does not impact the enforceability of the arbitration agreement."); *Rogers v. Nelson*, No. 16CV955-L (RBB), 2017 WL 1711155, *3 (S.D. Cal. May 3, 2017) ("The argument implies that Plaintiff did not read the documents he received in connection with his accounts. This is not sufficient to avoid arbitration."). But in both *Marchand* and *Rogers* there were written acknowledgments of receipt.

On the other hand, *Bolden* is – except with respect to the fact of Plaintiff being out on leave for parts of the opt-out period and with the employer in that case sending "reminder" e-mails – indistinguishable from the situation involved here. *See Bolden*, 2018 WL 4913901, at * 2. *Bolden* also cites numerous cases coming to the same conclusion on materially indistinguishable facts. *See id.* at *4-5. The only reason to find the decision not entirely conclusive on the point is that it is not based on California law. But Plaintiff has not given the Court any reason to conclude that California law is any different in these

respects. Certainly it is true that terms in contracts (or amended terms), including arbitration agreements, are frequently accepted through inaction. To apply a different rule here would be to treat arbitration agreements (or arbitration agreements in the employment context) differently than other contracts, an impermissible approach to the issue of enforceability (as mentioned above).

Plaintiff does not contest that Defendant and his supervisor expected and required Plaintiff to check his work e-mails when he was at work and, if they were absent, to read their unread e-mails when they returned to work. *See* Declaration of Arthur Williams, Docket No. 15-1, ¶¶ 2-5. He also does not contest that he actually responded to numerous other e-mails sent to his work e-mail account during the 30-day opt-out period. *See id.* ¶ 7 & Exh. H. Indeed, Plaintiff acknowledges that while he was out on leave for part of that 30-day period, he was also at work for approximately two weeks during that period. *See* Esquivel Decl. ¶¶ 3-4; *see also* Gomez Decl., ¶ 8 & Exh. F.

That Plaintiff was off work for part of the opt-out period is immaterial to the question of the agreement's enforceability, according to Defendant. It cites *Clearfield v. HCL Am. Inc.*, No. 17-CV-1933 (JMF), 2017 WL 2600116, *2 (S.D.N.Y. June 15, 2017) and *Pelligrino* as supporting that proposition. Indeed, in *Clearfield*, the employee returned from leave only *one day* before the opt-out period expired, and the agreement was still found to exist. *See* 2017 WL 2600116, at *2. Defendant also notes that several district courts in California have rejected the notion that the Ninth Circuit's *Najd* decision requires acknowledgement of the agreement in writing for the arbitration agreement to be enforceable. *See Winfrey v. Kmart Corp.*, EDCV 15-01873-VAP (SPx), 2016 WL 6666810, at *3-4 (C.D. Cal. Jan. 6, 2016); *Hicks v. Macy's Dep't Stores, Inc.*, No. C 06-02345 CRB, 2006 WL 2595941, *3 (N.D. Cal. Sept. 11, 2006).

In the end, the Court is persuaded by Defendant's position. The evidence supports the conclusion that Plaintiff was sent the e-mail announcing the implementation of the arbitration agreement and the opportunity to opt-out. The pre-existing employer-employee relationship made it reasonable for Defendant to make silence (in the form of a failure to opt-out) a permissible expression of assent. *See Najd*, 294 F.3d at 1109 ("[W]here circumstances or the previous course of dealing between the parties places the offeree under a duty to act or be bound, his silence or inactivity will constitute his assent.");

11

*Winfrey*, 2016 WL 6666810, at *4. While Plaintiff may have been out on leave for part of the opt-out period, he had ample time in which to review the e-mail and the arbitration agreement's terms. His failure to do so does not impact the existence of the resulting agreement. The evidence is also clear that he was expected to keep abreast of his work e-mails and that he was actively using his work e-mail account when he was at work during the opt-out period. Under these circumstances and the relevant case law outlined above, the Court finds that the parties did reach an agreement to arbitrate.

    B. <u>Defense to Enforceability</u>

In the event the Court concludes – as it tentatively has – that the parties did indeed reach an agreement to arbitrate, Plaintiff further attempts to argue that the agreement is unenforceable because it is unconscionable. "The [Federal Arbitration Agreement] provides that any contract to settle a dispute by arbitration shall be valid and enforceable, 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 921 (9th Cir. 2013) (quoting 9 U.S.C. § 2). "Like other contracts, arbitration agreements can be invalidated for fraud, duress, or unconscionability." *Id.* With respect to unconscionability, "[u]nder California law, a contract must be both procedurally and substantively unconscionable to be rendered invalid. California law utilizes a sliding scale to determine unconscionability – greater substantive unconscionability may compensate for lesser procedural unconscionability." *Id.* at 922 (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 99 (2000)). "Procedural unconscionability focuses on…'the factors of surprise and oppression in the contracting process.'" *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1063 (9th Cir. 2013) (quoting *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010)). Substantive unconscionability focuses on "overly harsh" or "one-sided" results. *See Armendariz v. Found. Health Psychare Servs., Inc.*, 24 Cal.4th 83, 114 (2000). The burden in demonstrating unconscionability rests upon Plaintiff, not Defendant. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 483 (1989); *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1158 (9th Cir. 2008); *Szetela v. Discover Bank*, 97 Cal.App.4th 1094, 1099 (2002).

    Plaintiff contends that the agreement is procedurally unconscionable because he was not given sufficient notice of, or a reasonable opportunity to negotiate or reject the

terms of, the agreement, relying on *CrossTalk Productions, Inc. v. Jacobson*, 65 Cal.App.4th 631, 644 (1998), *Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1106 (9th Cir. 2003), and *Fitz v. NCR Corp.*, 118 Cal.App.4th 702, 722 (2004). He notes that he was out on leave for 16 days during the 30-day opt-out period provided. Nevertheless, given the foregoing discussion of how the agreement was communicated to him and his ability to consider it, the Court easily concludes that Plaintiff was provided a "meaningful opportunity" to review the arbitration agreement. It also agrees with Defendant that participation in the Program and its arbitration agreement was optional and that the terms of the agreement were clear. *See Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199 (9th Cir. 2002) ("[T]his case lacks the necessary element of procedural unconscionability. Ahmed was not presented with a contract of adhesion because he was given the opportunity to opt-out of the Circuit City arbitration program by mailing in a simple one-page form."). Plaintiff has no hope of making out procedural unconscionability by way of a theory of insufficient notice or opportunity to negotiate/reject the terms.

Plaintiff then takes the position that the agreement is also unconscionable because it fails to make specific reference to, and fails to attach, the arbitration rules.[9] Here, Plaintiff relies again on *Fitz*, and also on *Zullo v. Superior Court*, 197 Cal.App.4th 477, 485-86 (2011). On this point, Defendant responds that *Baltazar v. Forever 21, Inc.*, 62 Cal.4th 1237 (2016), *Peng v. First Republic Bank*, 219 Cal.App.4th 1462 (2013) and *Lane v. Francis Capital Management LLC*, 224 Cal. App. 4th 676 (2014) all weaken the import of *Fitz* and *Zullo*. Indeed, *Baltazar* appears to have redirected this strain of unconscionability analysis towards focusing on whether the plaintiff actually challenges "some element of the . . . rules [in question] of which [he] had been unaware," dismissing such a challenge when it actually has "nothing to do with the AAA rules." 62 Cal.4th at 1246; *see Nguyen v. Applied Med. Resources Corp.*, 4 Cal.App.5th 232, 248-49 (2016) (discussing impact of *Baltazar*); *see also Ramos v. Superior Court*, 28 Cal.App.5th 1042, __ (2018) ("[W]e do not subject employment contracts 'to the same degree of scrutiny as [c]ontracts of adhesion that involve surprise or other sharp practices.'") (quoting *Baltazar*,

---

[9] Defendant's argument that the agreement "expressly incorporates the AAA rules" because it refers to selection of an arbitrator "who is a current member of the American Arbitration Association (AAA) and is listed on the Employment Dispute Resolution Roster" is unconvincing. *See* Docket No. 15, at 25:18-20; Docket No. 15-1, Exh. C. at pg. 28 of 61.

13

62 Cal.4th at 1246).

Even if that is, for some reason, an inaccurate reading of *Baltazar*, *Peng* held that the failure to attach the rules of an adjudicating body contributes to surprise only if the rules are found to contain unexpected provisions that limit the scope of the plaintiff's claims or otherwise affect the relief available. *See Peng*, 219 Cal.App.4th at 1471-72. Plaintiff has not identified any rules Defendant asserts are applicable to the arbitration that will be held in this case that limits the scope of his *claims* or otherwise affects the *relief* available to him. And the AAA's rules are easily accessible on the Internet. In any event, both *Peng* and *Lane* commented that any failures with respect to identification/ attachment of applicable arbitration rules were, in the end, of only minor significance to the overall unconscionability analysis.

Finally, Plaintiff argues that the agreement is unconscionable because it imposes a penalty for challenging the enforceability of the agreement. Specifically, Plaintiff points to the following language in the agreement:

> If any judicial action or proceeding is commenced in order to compel arbitration, and if arbitration is in fact compelled or the party resisting arbitration submits to arbitration following the commencement of the action or proceeding, the party that resisted arbitration will be required to pay to the other party all costs, fees and expenses that they incur in compelling arbitration, including, without limitation, reasonable attorney's fees.

Docket No. 15-1, Exh. C, at pg. 29 of 61. Plaintiff quickly acknowledges that "the terms of the clause are, on their face, applicable to both parties," but nevertheless argues that "[t]he clause can only ever benefit Defendant." Docket No. 17, at 14:25-15:2.

Defendant agrees that the provision is mutual, and argues that this precludes Plaintiff from arguing that it is substantively unconscionable. The Court concurs. Indeed, this is not a case involving an agreement that "require[es] arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." *Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257, 1285-86 (9th Cir. 2006) (omitting internal quotation marks) (citing *Armendariz*, 24 Cal.4th at 119). It may be true that the majority, or even the vast majority, of disputes that might arise between an employee and employer and thereafter be litigated in one forum or another would be actions filed by an employee (or employees) or someone on their behalf. But this does not make the agreement non-mutual.

14

The Court therefore concludes that this term does not contribute to any type of unconscionability, and therefore has no need to consider whether the provision could or should be severed.[10]

Lastly, Plaintiff argues that, pursuant to *Broughton v. CIGNA Healthplans of California*, 21 Cal.4th 1066, 1079-80 (1999), his claim under Business and Professions Code § 17200 is not arbitrable because it seeks equitable relief. As Defendant notes, however, Plaintiff's present allegations do not clearly request injunctive relief in connection with his Section 17200 claim (though the Court believes paragraph 22 of the Complaint could be read to inartfully request such relief). In any event, even assuming the question of arbitrability of a Section 17200 claim would be for the Court to decide (notwithstanding the seemingly clear language of the arbitration agreement to the contrary), the Ninth Circuit has held that the *Broughton* rule is preempted by the Federal Arbitration Act. *See Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 933-37 (9th Cir. 2013). Plaintiff may not, therefore, employ this argument (at least in this forum) to avoid arbitration of any aspect of his case.

Even if the Court were to agree with Plaintiff that a failure to attach the applicable arbitration rules contributed to a finding of unconscionability, this would be the only aspect of his unconscionability argument that he would prevail on. Because he must demonstrate both procedural and substantive unconscionability, *see Chavarria*, 733 F.3d at 921, Plaintiff's attempt to invalidate the agreement by way of an unconscionability showing necessarily comes up short.

### III. Conclusion

The Court has determined that the parties reached an agreement to arbitrate, and it rejects Plaintiff's attempt to challenge the enforceability of the agreement through an unconscionability argument. As such, the Court will grant the motion to compel arbitration. "The Federal Arbitration Act requires a court to stay an action whenever the parties to the action have agreed in writing to submit their claims to arbitration." *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1048 (9th Cir. 1996); *see also* 9 U.S.C. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue

---

[10] The Court takes no position on whether this motion to compel arbitration amounts to the "commence[ment]" of a "judicial action or proceeding" for purposes of application of this term of the agreement.

referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement…."). As a result, this action will be stayed pending completion of the arbitration.